brought his final case this morning for all 2-11-089-7 People's State of Illinois v. Maisha T. Sawyer. On behalf of Ms. Sawyer, Mr. Jack Hildebrand, on behalf of the people, Mr. J. Hall. Now, I know we're starting a couple of minutes early. Is anybody expecting anyone that needs to be here? Because I don't want to start if he's there. I was wondering if you were. All right. Then, if you're ready, Mr. Hildebrand. May it please the court, my name is Jack Hildebrand. I'm representing Maisha Sawyer in this matter. We have two problems in this case. The first problem is that Maisha's credibility was improperly attacked. And the second problem is that Mr. Jinks' testimony was improperly bolstered by the court and by the state. This was a close case. And that's why this error that we're complaining about is so prejudicial. I mean, based on the record. How do you define a close case? Well, I believe that there was evidence in the record that the jury could have found that Ms. Sawyer's recollection of the event was credible. She claimed that he had made sexual advances towards her. And when she let him know that she did not want to have anything to do with that, she put up her hand. And he grabbed her hand and then threw her down. And then she grabbed the bottle. Correct. And, you know, we have Mr. Jinks testifying that he was drinking. He was looking for women. He went over to the bar to wait for girls to show up at this house. He had purchased alcohol because women were going to be there when he goes over to the apartment. He is told by his friend Sloan that there's a woman coming over and he says that, well, I'm going to decide I'm going to stay here to see what she looks like. She comes over, comes in. He recognizes her. He gives her alcohol. And based on that, I mean, the jury could infer that that was consistent with what Ms. Sawyer had testified to. And what about the officer's testimony about Jinks' statements when he came into the apartment right after this incident happened? He said that the first thing that Jinks said was, I didn't touch her, I didn't touch her. So there is, you know, all these cuts and serious injuries here, and he's saying, I didn't touch her, I didn't touch her, when there was no allegations of sexual misconduct that had been alleged. And he certainly did not say anything about any kind of sexual conduct between the two of them before anything happened. So why is he immediately defending himself against some kind of sexual conduct, the first thing out of his mouth? And the jury could have looked at that and said, well, that's not – that actually corroborates Ms. Sawyer's testimony more than it really helps what the defendant was saying. But in the end, it doesn't look like that's what the jury – you know, I didn't touch her, I didn't touch her, may not – didn't impress the jury. I mean, it apparently didn't because she was found guilty. Correct. But that's – if the jury had not been informed about this extracurricular activity, that's the difference. That's the error. That's what, you know, that's what really – we're really getting at. Are you talking about the – what's the extracurricular activity? The prior incident. I mean, basically, Jase was allowed to testify, and he basically tells the jury that Ms. Sawyer is a homophobic bigot who is a really mean person. You know, she is bad. And he was permitted to testify that without any reason for – you know, evidentiary reason for this coming in, but to show that she's a bad person. And if the evidence is close, as I say that it is, and argue that it is, then that is – could have been the turning point that, you know, changed the course of the deliberations against her. She may have been found innocent of these charges, but for that testimony. How about the judge's comments with respect to the uniform or with respect to the military? Well, the judge should have never said that. I mean – But did he know at the time he was instructing the jury that this case was going to involve a military individual? I don't know. And does that matter? Oh, I don't think that matters at all. I think that looking at the record, I don't recall seeing anything that would suggest that he purposely did this. Ordinarily during jury selection, if there's perceived error, the issue is waived unless there's a timely objection, correct? Yes. And there was no objection here? No, there was not. And the jurors were questioned regarding their feelings towards members of the military during voir dire, correct? I don't recall that. I believe it might be at page 14 of the state's brief. There was voir dire. It wasn't just the judge's comment, correct? If that is true, then it really wouldn't change my argument because this is a bolstering coming from the court itself. The comment was not that members of the military are believable. The comment was to enhance the jury's feeling towards jury service, their responsibility. He equated it to service in the military and upholding our freedoms, just like judges do thousands of times a day in every courtroom in the country. I agree with you. He did make it in that context. There are laudable motives of the judge to have the jury appreciate their responsibility, not to prejudice your client in any way. Well, I can understand that argument, and I have no problem with accepting that argument. However, telling the jury that this is the highest way to serve your community, nevertheless, is heard by the jury. It's going to be a complaining witness that's going to show up in his Navy outfit. You tie that together with the prosecutor's argument that the victim was a quote-unquote Gomer Pyle-type person. Well, he was in the United States Marine Corps. Could he have both a positive and a negative? Well, we can assume that Gomer Pyle never lied to Sergeant Carter, and it was a light way of doing it, but it was set up. It was all set up previously with all this really serious stuff. He's spending his whole time, his whole life, is dedicated to the Navy and protecting our freedoms. Was there an objection to the whole Navy background, what he was doing, his education? No, there was not. The defense counsel probably wanted some of that to come in. Because he wanted to call him the drunken sailor in closing argument. Well, isn't that a fact? Well, you know, he's a sailor and he was intoxicated. That's based on the facts. But saying that because you're in the service, you don't lie, that's more of an emotional or an insinuation. That's not based on the facts. I mean, that's not even a response to that. Well, didn't defense counsel object during this part of the closing argument, maybe not right after the Gomer Pyle reference, but where he compared Gomer Pyle to the mass communication major that's your client and the violence? Didn't he object at some point? Yeah, he did object. I think it was closer to the propensity argument. But getting back to the Gomer Pyle thing and this evidence, when the evidence came in, it was not prejudicial one way or the other. All this evidence about his service and what he was doing, it was neutral and probably irrelevant, totally irrelevant, and could have been objected to. But wasn't it laying a foundation basically for what a great military guy, you know, great, honest, hardworking, and it wasn't that laying a foundation, all of that questioning. And it was excessive questioning with respect to this guy's personal duties at the base. I would agree with that, except for the honest part. No, that doesn't really. It shows that he was spending a lot of hours working for the military, yes. But how that information was used made it prejudicial. Well, but coupled with coming off the heels of a judge saying, you know, the most important responsibility one has is serving their country, and second, jury duty. So why didn't the defense object at that point? The motion eliminates the judge when this guy takes a stand. I would, you know, limit what they're going to ask him about his background. Nobody objected. About his background. Well, about, yeah, his background on the base. They went on and on about what they did on the base. Yes, they did. But that's not what you're complaining about. It bolstered what the judge said. If you were to believe that what, your argument that what the judge said bolstered this guy's credibility, the defense, in my opinion, only let it bolster more. Wouldn't you agree? Well, if it did bolster it, then, and counsel did waive it, we've raised this as a plain error argument. So if this did violate Ms. Sawyer's right to a fair trial, the whole purpose of the plain error rule is a safety valve for allowing for a new trial when a person doesn't get a fair trial. It doesn't matter whether counsel waived it or counsel was bad or didn't speak up at the right moment. That's included in our second argument that this was plain error. I mean, I'm admitting that this was waived, and I had to raise it that way because it is waived. But, nevertheless, we have a closed case here, and there is evidence that the jury could have gone either way, if we didn't consider this other evidence that we were complaining about. But wouldn't just showing up in the uniform accomplish the same problem? I mean, he did not have to show up in his uniform. He did. There was no request that he not show up in his uniform. I mean, we're seeing a soldier, and he's going to testify to where he's been and what he's done. And even if it's limited, as has been suggested, he's going to show up in his uniform. Isn't that going to do something? I don't think you can keep that from a jury that he's in the service. I mean, we always allow background, some kind of background information. Well, sometimes attorneys will, in an aggravated battery against a police officer, sometimes the attorneys will move and eliminate ask that the officer address in street clothes, and oftentimes the prosecutor will agree to that. Counsel could have done that in this case. Well, if he could have done it, he didn't. And we're left with the error. And we're left with, was this a fair trial? I mean, if counsel did something that denied her a right to a fair trial, then we need to give her a new trial. And the way we do that is through the plain error exception to waiver. That's what it's there for. And when a police officer testifies, he says, of course, I arrested this person. Everybody in the room knows that that's a police officer. You can never keep that out. And how long have you been serving? I've been serving, I'm a detective. I've been serving 15 years, you know, with Metro, blah, blah, blah. That evidence in and of itself is not prejudicial one way or the other until it's used improperly. Like, hey, this is a police officer we're talking about. Then it becomes error. That's when it becomes error. It doesn't become error when it comes in. I mean, all this information about what he does at the Naval Reserve and all that kind of stuff, going to classes and everything, initially that's just irrelevant and has no real prejudicial impact against the defendant or against the state one way or the other. Going back to the argument regarding the other crimes issue, your argument is that that evidence was improperly used as propensity evidence by the state, correct? I believe that it was improperly presented to the jury and used by the jury, regardless of what the state's argument was. The state's argument just exasperated the thing, that the real reversible error that occurred was Jinks' testimony about it because he's calling her a bigot, he's calling her mean, spirited, insensitive. That's the evidence that we're objecting to because there was no reason for it to come in. That evidence, we do not allow that evidence in the trials. And once it's absolutely necessary for the state to bring it in, to prove up something that's important in the trial. The name-calling or the incident? I'm a little confused. Do you think it's the name-calling that's the problem or the fact that they had a confrontation of sorts? Yes, both. There was probably some bad blood between them because that would go to intent. This evidence doesn't come in not because it's not relevant or probative. That's why it doesn't come in. I mean, we want the jury to be determining the case based on the evidence of the incident that she's charged with. Well, doesn't a prior altercation go to motive and intent? No, it does not. Not in this case. And there was no limiting instruction given either. Is that another? No. I'm not even sure what the judge's thinking was about why this was admissible. In fact, this propensity argument that was made was clearly error on the part of the state. The judge may have believed that that was the proper use of the evidence for all we know. I'm not really sure that he ever made it clear. And if he had done his job, he's responsible for instructing the jury. The defense counsel's not going to ask for an instruction that he thinks is wrong to begin with. I mean, instructing the jury that, oh, you can use this for, well, actually the state argument, intent, or identity and motive at the trial. And he said, well, if you can't use it for motive, then what's left? Identity. I mean, how do you assume then that that's the reason why the judge wanted him to prove up identity when identity wasn't an issue at all? So, anyway, this evidence, if it was a closely balanced case, as I'm arguing, and it was a credibility determination, her credibility was attacked improperly, his credibility was improperly raised, and here we have a jury now, not with just the evidence about he said, she said, he said, she said about the incident. They've got this stuff over here that, hey, she's a bad person, you know, the state's calling her a violent person, and that could have thrown the balance against her in this close case. So she should get a new trial. Thanks. Thank you. You'll have an opportunity for a reply. Mr. Hoffman? Good morning, Your Honors. Good morning. May it please the Court, I am Jay Hoffman. I represent the people of the state of Illinois in this case, as always. First of all, I just want to get to a couple matters that Mr. Hildebrand touched on with regard to the victim. You said, well, when the officer came in, the victim said, I didn't touch her, I didn't touch her, and Mr. Hildebrand says, well, that should be taken to mean that I didn't sexually assault her. I don't understand that. I don't understand how you go there. Maybe it's the mattresses on her. Well, maybe it's when Mr. Hildebrand says, because he said, I didn't touch her. I mean, if I came to my kid and he had had a fight with someone, and my kid said, I didn't touch him, I didn't touch him, I wouldn't assume that it meant, oh, I didn't sexually assault him in some way. It was, I didn't institute the fight, which is what I think the victim was trying to say here. That he just volunteered to the police. He just volunteered that to the police. Yeah, I don't think. I think counsel's argument that that tends to support the theory of self-defense is, that's a credible argument. Because usually when people are bleeding, they're looking for assistance from medical personnel, not defending themselves against an unwarranted charge from the police. That's true, Your Honor. That's a credible argument that he made, regardless of whether or not he referred to sexual assault. Yeah, and that's all I was going to, that he seemed to indicate that that supported her statement that, oh, he was trying to come on to me, he was getting sexual and stuff, and I don't see how it goes there at all. It certainly tilts the scale more towards his argument that the story's not exactly credible. Well, one could take that on the other hand. One could say that he wanted to make it clear that he hadn't done anything. I think that argument cuts both ways, Your Honor. I also disagree with his argument that the errors here all have to do with building up the credibility. Certainly with regard to motive, it's a secondary fact. It's not, this evidence was not admitted to say that she, on technical credibility grounds. Likewise, I absolutely disagree, as I've set forth in my brief, that the people's argument with regard to mentioning his being in the Navy or the military had anything to do, if you look through what it said, he never says, jury believe, like the cases they cite, unlike that, he never says, believe him because he's in the Navy, come on, he's an armed forces guy. No, that's not what it's about. He's responding to the arguments, as you alluded to, Justice Bruchette, not only in the closing argument by a defendant, but in the very opening statements. The first thing he says is, we've got a drunken sailor here looking for women. That's what this is all about. So to the extent there was any error in mentioning that he was in the Navy during the closing arguments, first of all, it didn't go to credibility, and second of all, it was invited. Well, that's a textbook mistake by the prosecutor then, because your closing argument is supposed to be about the evidence, not about what was said or not said in the opening statement. Well, no, it was about the evidence, but it was in response to the defendant's theory of the case. And what the defendant said, both in opening and in closing, which is textbook invited error. Not error, but invited argument. Were the prosecutor's comments about credibility of the victim only in rebuttal argument, or were they made also in opening argument? I don't recall, Your Honor. I'm sorry. Mr. Hoffman, how do you distinguish people versus Gray? I lost you, Your Honor. Gray was... It's a soldier. It's a case with a soldier. Oh, the testimony? Because I think in that case, like, that's one of the cases he cited, and the other one he had to do with a police officer, and he's weighing the police officers. The argument here was not that he was more credible because he was either a police officer or a soldier. What he said, what the prosecutor said here was, and he referred to defense arguments, and he says, you know, defense argument calls him a drunken sailor, and he works hard. It's okay for him to go out on weekends and enjoy himself and relax and party and drink. And he also said, and the defense counsel says that, what was the other argument? He talked about him, well, he responded to the arguments. I don't remember what the other point was now, but it wasn't about his credibility. But didn't the defendant say he bought alcohol and he brought it to the party because there were going to be women there? I mean, he's got something in mind. And that was part of the argument, but, yes, he mentioned that, and he mentioned that, well, he said, somebody's coming over, so I decided to wait and see if she was good looking. All right, but then in closing argument, the state says she has a violent tendency. After the state says two times she's been violent, two-time violent against the victim, what makes sense is that this woman is violent, she has a violent tendency. Yeah, to the extent that the way it was put, a violent tendency, that would indicate a propensity argument would be improper. I would argue that it has to be taken in the context of speaking specifically of the two instances and those who have gone through during the evidence and closing argument about how they were similar, about how they happened, that this woman, and that's why I believe there's no doubt that this evidence was admissible for motive purposes because the purpose is to show that, no, it wasn't in response to some physical action by the victim here. What it was was this woman was unhappy because, in the first instance, she had somewhat been gotten the better of by him because she said, well, because you know gay terminology, I can tell you're gay. And he says, well, by that logic, I can tell that you're a child molester. And the people all around laugh and she gets mad and what does she do in response to being laughed at and being told that he can tell this? She grabs him by the throat and pushes him against the wall. And that's the same thing she does the next time when, according to his testimony, he calls her an ignorant bitch and she grabs him and pushes him against the wall because they're arguing again. So, yeah, in and of itself, if we can only argue that, and we didn't use the term propensity, but only argued that there was this violent tendency, but it has to be tied to the specifics of each instance. Isn't it incumbent on a prosecutor to, when you're offering evidence of other crimes, to at least prepare another crime's instruction for the jury so the jury can properly weigh that evidence? I don't know if it's incumbent upon the prosecutor, Your Honor. I would say that's the defense instruction. But it's also a prosecutor's instruction, especially where the defense has objected to the evidence, there's been a hearing on it, and then you don't offer an instruction and, in closing argument, argue propensity, which is what happened here. Well, the question of the instruction, as I argue in my brief, is forfeited because the defendant is responsible for giving the instructions that he wants for his defense. And as this Court recently said, it may be well that he didn't want to accent it. But you, not you personally, but the State wanted the evidence. And I think that's the point. The defense didn't want the evidence. The State wanted to introduce the evidence. They said for identity and motive. Well, they didn't highlight motive, but they said identity. For identity. They were not clear, so the judge sort of decided. But now they want the evidence. If you want the evidence, if it's your evidence, why would it then not be maybe not incumbent upon, but why would you say, well, if it's not my job, it's his? Because it's not my job, it's his. He's the one. No, he didn't want it. If the defendant wants it limited against his defense counsel wants it limited against his client, against the defendant, it's his responsibility and that's the law. So the State did want it limited. And therein lies the problem. They may not have wanted, they may not have cared. But the point is. The point is that you're limited by the law. You can't argue. There are two areas where you can argue propensity, domestic violence and sexual, sex offenses. That's it. You can't argue propensity evidence in an aggravated battery where you're using prior evidence of force against the victim. I agree, Your Honor, but that's a different issue than the instructions. That doesn't mean that we are responsible for giving the instructions. And I, again, would say that the law indicates otherwise. Because if that were the case, it wouldn't be forfeited when the defendant doesn't give the instructions. As happened here. Mr. Hoffman, six times in the State's closing arguments, they referred to your victim as a quote-unquote trained soldier. Six times. Coming on the heels of the statement by the trial judge. Coming on the heels of the State putting its witness on and questioning him for a lengthy period of time as to what his duties and responsibilities are at the base. Coming on the heels of your trained soldier, if you will, coming into court in full uniform. Do you think that any of those things individually or taken together may have given the impression to the jurors that he might be a more credible witness than the victim? I don't think so. The trial judge's comment on that was very isolated. And as I pointed out, after that, the trial judge very carefully, three times, before voir dire, before the trial, and during closing arguments, said, do not decide on the basis of anything but the evidence. Not any bias or anything. And as I pointed out, there were several questions, not to every juror, but to general panels and individual jurors, mostly by defense counsel, saying, do you have any friends in the military? Do you have any prejudice towards or against the military? This was all very clearly gone through. And again, at the end, the trial judge gave the standard instruction saying that the testimony of the defendant is to be treated the same as anybody else's testimony of the victim. We have an instruction with respect to police officers, the testimony of a police officer should not be given any more weight or any less weight than any other witness. Was any instruction like that given with respect to? Not specifically, and I know of none. And I forget who, if you were speaking of our argument or the defendant's argument, but remember it was the defendant who several times, in an attempt to bolster her argument, the defense counsel repeatedly said, well, this is a trained soldier. This is a trained soldier. Look at the way he took her down. This is a trained soldier. That was all part of their argument. And we merely responded to that. Yeah, you know what? You're right. I stand corrected. That was the defense. Yeah, so they were, and that was consistent. That was consistent with what they began before the trial and argued throughout the trial. It was the defendant who wanted to bring up the fact that he was a soldier, and now the defendant's crying about it. If there are no other questions, Your Honor, I'll just ask you to read the brief and affirm the conviction. Thank you. Thank you. Mr. Hildebrandt. Mr. Hildebrandt, how do you now make these arguments when I stand corrected it was the defense who six times referred to this individual as a trained soldier? The argument that the state has made was in response supposedly to calling Mr. Jinks an intoxicated sailor. Now, if it's a new argument that he was a sailor, well, he was a sailor. That fact is not prejudicial one way or the other. What is prejudicial is using that fact to say he is more credible. Who said that? The state did, and the court did. By introducing the fact that he, or the court by saying, you know, your service as a juror is as important as being a soldier or something of that nature. Well, not quite as second to being. I mean, that was the time. And, you know, the jurors are listening to a judge. This is a, you know, jurors look up to judges. This is a very important position in our society. And they're thinking, well, you know, they could have taken that. He's sending us a message. This is one of our citizens out there fighting for us. That is a very, very common. There's very little guidance other than the Supreme Court rules, two rules that provide guidance to the courts. There's their principles and then the manner in which a jury is selected in panels. And then there's a great deal of discretion for trial judges. And most trial judges give an opening statement and try to reinforce on the jury the importance of their service to the protection of our freedoms. Isn't that really what happened here? Yes. And so what you're suggesting is that the state took improper advantage of that in closing argument. Is that correct? That's accurate. I still say that what the judge said had an influence. Even if it was intended to be something, you know, positive, you know, for the jurors to show them how much we respect their showing up for their duty. That's not what came out because, well, first of all, that type of statement to the jury should never be made in Lake County. The naval base is right there. The chances of somebody from the Navy being called in to be a witness at a trial there is higher than anywhere else. Something else should be said, you know, to show the jurors, you know, the value of their service and what it means to Lake County. And that would be appropriate. I understand what the judge is trying to do, but the jurors are going in there and they're hearing this from the judge. You know, that is the highest standard. And then Saylor comes in and sits down. What is it? What kind of effect is that going to have on just, you know, a regular jury? Is the judge telling us something here or what? Or are we supposed to, you know, he's in his uniform on top of it. This motive, this motive thing, you know, if, first of all, the judge said you can't use it as motive. I don't think the state was sure, is even sure about why this should come in, this evidence should come in. At first they argued, I believe it was identity and motive. And then for the first time in their briefing, argued intent. But that would apply. I think it probably should have come in a rebuttal for the self-defense claim. Probably. Probably should have been used in rebuttal as opposed to their case in chief. There was a self-defense claim. Yes. Yes, but there's no exception for that to come to the prior violence for self-defense. I mean, if the defendant wanted to bring in prior violence of Mr. Jenks, she could have. And she could have brought in as much as she could have found. I mean, that's what Lynch is about, right? Lynch says, but in Lynch, I mean, even Lynch, the court says, hey, you know, this may be true for the complaining witness. But the same isn't true for the defendant because the defendant has due process rights. And has a right to have a fair trial in front of an unbiased jury based on just the evidence that surrounded the incident that he's charged with. And claiming that these two incidents were identical is just not correct. Well, they were fighting about the same things. Pardon me? They were disagreeing about the same issues, about religion, about social mores. So, I mean, it wasn't like they picked new things to argue about. They had this similar situation. She didn't like him and he didn't like her because they were calling each other names. And that is relevant to this and would show not only identity, but I think could have shown intent. Intent, the state was required to prove that she intentionally hit him with a bottle. Bringing that evidence in for under that rubric is nothing more than propensity evidence. And if she had walked into that room, sold his apartment, saw Jinx, that's that guy from last week, pick up the bottle, broke it, went up and slashed his face. Then I think the state would have an argument that we need this evidence here to show motive. Because now the motive is now transferring over to the second one. But in this case, we don't have that. We have motive of why. When he walked in, they were fine together. He didn't get on, I'm getting out of here, or she didn't say, oh, I'm getting out of here. No, they stayed together. Everything was fine. And the state presented motive. They didn't need motive evidence. He testified what the motive was. They started insulting each other. He said, you're a nigger, bitch. I'm getting out of here. He gets ready to leave. She attacks him. That was the motive for this incident. And she had a right to be tried based on the facts of this incident. Unless there was an exception. How is the evidence close? The evidence is close because based on what she testified to, the jury couldn't believe it. And remember, the things that I talked about before, I mean, this unsolicited comment, which we've already gone over. But he even discredited his own testimony when he acknowledged that in his written statement, he left out the part about, oh, she grabbed my neck. And he says, well, I didn't forget. I forgot about that part because I've been drinking and I took a painkiller. Well, that is excused. It's quite suspect considering that he remembered the paramount timeframe of when this little incident started. And I think it's reasonable to conclude that a person in that type of situation, if he's going to forget something, that's the last thing you're going to forget, somebody grabbing your neck. Yeah, but that's an issue for the trier of fact. That's correct. And the trier of fact was prejudiced in this case by learning about this other incident where Jason's testifying about her bigotry and her meanness of grabbing the collar. And the state has argued that these were the same incidents. He grabbed her neck at the first. He didn't grab her neck at the first one. And the response in the incident that we have, the actual response is the reason for her hitting him was after he flirted. It wasn't in response to an argument. And there was no claim of self-defense in that first one either. Thank you, counsel. All right. Thank you for your argument. We will take the matter under advisement, and we will now stand adjourned.